## Case No. 10,655.

### The PACKET.

[3 Mason, 334.] [1]

Circuit Court, D. Massachusetts. May Term, 1824.

MARITIME LIENS—FACTOR—ADVANCES—PROCEEDS —COSTS.

1. A factor, to whom a general shipment has been entrusted as security for advances, commissions, and expenses, has a special property only in the shipment, and subject to his lien for those charges, the owner may dispose of them as he pleases, and the conveyance will carry the right.

[Cited in Boston & M. R. Co. v. Warrior Mower Co., 76 Me. 261.]

2. In the admiralty, where the factor, and the persons claiming a derivative title under the owner, contest the right to the proceeds, the court will decide upon the equities of all concerned, and decree the amount of the lien to the factors, and the residue of the proceeds to the other claimants.

[Cited in Leland v. The Medora, Case No. 8,-237; The Lady Franklin, Id. 7,983.]

3. If, in such a case, a factor sets up a title as general owner, and not merely for a lien, he will not be entitled to costs.

[Cited in Hunter v. Marlboro, Case No. 6,908.]

The principal questions were disposed of at the hearing at the last term, and the opinion of the court will be found [in Case No. 10,-654]. Messrs. Swett & Hammond, however, claimed a right to the proceeds of certain goods, part of the cargo, under the following circumstances, which were stated in the report of the auditors. On the 27th of June, 1821, Captain Barker entered into an agreement with them as follows: "Memorandum of an agreement made between Swett & Hammond, and Samuel P. Barker, all of Boston. The said Barker agrees to pay Swett & Hammond one per cent. for endorsing his bills on Thomas Wilson & Co. of London, at sixty days' sight, for £1500 sterling, and the said Barker agrees to deliver to Swett & Hammond the following merchandise, as collateral security, viz., 82 boxes of brown Havannah sugar, 72 do. white sugar, 72 barrels of coffee, 52 bales of cotton, valued at $9983,-08 (in the aggregate). And it is further agreed, that Swett & Hammond are to ship the above merchandise to Steiglitz & Co., St. Petersburg, or Good, Rainals, & Co., Copenhagen, for sale, and the proceeds subject to the order of said Swett & Hammond, and on the arrival at Boston of the returns from Copenhagen or St. Petersburg, the merchan-

[1] [Reported by William P. Mason, Esq.]

dise to be consigned to the said Swett & Hammond, who are to enter and sell the same, and charge a commission of two and a half per cent., and when the money is received for the sales, it is to be paid over to the said Barker by Swett & Hammond, provided the bills before mentioned are paid. The said Barker is to pay all expenses, and to be at all the risk. The said Swett & Hammond are to get the property insured out and home, and in case of loss, the amount insured is to be paid over to the said Barker, after deducting two and a half per cent. and all other charges."

Captain Barker had previously bought, at New York, a quantity of coffee and sugar, amounting to upwards of $25,000, which goods had been pledged to Swett & Hammond, as collateral security for advances made by them, to pay for the same at New York. These goods were shipped from New York to Boston, consigned to Swett & Hammond, and after their arrival, several parcels of them were sold to Thomas Welsh, William Oliver, P. & T. Curtis, and Samuel Upton and Hawkes Lincoln. A part of the same purchase was the sugar and coffee referred to in the foregoing memorandum. The goods, stated in the memorandum, were shipped in the Packet, and consigned by Swett & Hammond to Steiglitz & Co., at St. Petersburg, for sales and returns. Steiglitz & Co. acknowledged the receipt of these goods, and sent a separate account of sales of them to Swett & Hammond, and shipped to them, as returns, certain goods, viz. 716 bars of iron, 7 bundles of hemp, 50 packs half duck, 25 casks of tallow, and 463 coils of cordage, the proceeds of which were now claimed by Swett & Hammond. The bills drawn by Captain Barker on Thomas Wilson & Co. for £1500 were duly paid; and Captain Barker stated before the auditors, that he considered the memorandum contract with Swett & Hammond thereby terminated; and as he had procured Steiglitz & Co. to consign to Swett & Hammond an amount of goods equivalent to the amount pledged to them, on which they would receive a commission, he thought himself at liberty to appropriate his own property so shipped as aforesaid by Steiglitz & Co. as returns, to such of the other shippers as he pleased. He accordingly appropriated to P. & T. Curtis 114 coils of cordage and 4 bundles of hemp; to A. Aspinwall 381 bars of iron; to Samuel Upton the residue of the iron, three bundles of hemp, and 114 coils of cordage. The 50 packs of half duck and 25 casks of tallow he considered as appropriated to Swett & Hammond, as returns for an invoice of $3151,57, consigned by them, on the intended voyage, to Captain Barker, for sales and returns. The bills of lading of the respective appropriations were handed to Curtis, Aspinwall, and Upton, by Captain Barker on his arrival at Boston; but Captain Barker stated, that the appropriation was made at Cronstadt, and let-

ters of advice and bills of lading were sent by him to them from thence accordingly; but they never reached the parties, who had no notice of the appropriation, until the arrival of the ship at Boston. The claim of Swett & Hammond was not for a lien, but as general owners of the property. The 463 coils of cordage above referred to were also claimed in behalf of J. J. Pflug of Cronstadt, as his own property. The facts, as stated by the auditors, were as follows. A bill of parcels of 463 coils of cordage, and 2 cables, signed by J. J. Pflug, at Cronstadt, on 16th of September 1821, with the weight and cost, was produced, containing a statement, that it is "shipt on joint account on board the American vessel Packet, bound to Boston," and charges Captain Barker with his half of the amount of the cost, and adds, "you will have the goodness to pay my brother, Mr. Charles Pflug." Captain Barker also produced a memorandum of account in the handwriting of J. J. Pflug, in which he is charged with the one half of the cost, and is allowed certain credits, leaving a balance due to Pflug of reals 3626,17, to meet which balance Captain Barker stated, that he left in the hands of Pflug property amounting to $1000, out of the proceeds of which Pflug was to receive his balance. There was also a letter from J. J. Pflug of the 29th of September 1821, to Captain Barker, in which he states, "agreeably to our mutual consent, I have shipped for joint account and risk on board the ship Packet, B. No. 1 to 465, 40 tons of tarred cordage, weighing &c. (the exact amount in the bill of parcels). Further, have loaded in said ship, on my own account and my own hazard, 8 hawsers, weighing &c., which permit me to consign to your good self, and request you will be good enough, on your safe arrival at Boston, to dispose of the above hawsers, as well as my half share of the above 40 tons cordage, to the best advantage possible, and be pleased to remit of the net proceeds $2000 to my friends Messrs. William & James Levin in London. The insurance for these 44 tons cordage, you assure me has been already effected; will you therefore be good enough to say at what rate of primage, &c." In a postscript he adds, "the residue of the proceeds, after remitting the $2000 &c., I shall settle with you here in 1822, or otherwise through my friends in America, in case of your not arriving at that time." Captain Barker advised Steiglitz & Co. of this shipment on board of the Packet, and signed a bill of lading for the whole of the cordage, as shipped for account of Swett & Hammond, and consigned to them. The reason of which was, as he stated, that the property might be covered by an insurance, which Swett & Hammond had caused to be effected for him on the voyage out and home. Captain Barker also signed a bill of lading for the whole quantity of cordage, as shipped by said Pflug, but consigned to himself (Barker) at Boston.

Upon these facts, stated at large in the report of the auditors, several questions arose in respect to proprietary interest, which were referred by the auditors to the court for decision.

Hubbard & Gorham, for Swett & Hammond.

Mr. Aylwin, for Pflug.

Mr. Welsh, for Aspinwall, Curtis, and Upton.

STORY, Circuit Justice. The first question is as to the proprietary interest of Swett & Hammond in the goods in controversy. The proceedings of the master were certainly somewhat loose and irregular, and not so satisfactorily explained as the court could desire. Still the court must, in the absence of all contradictory proofs, take the facts to be as they were stated by the master before the auditors, and reported by them, for he is certainly a competent witness, standing in point of interest indifferently between the parties. The claim of Swett & Hammond is framed so as to present only a general and absolute proprietary interest, and gives not the slightest intimation of such a qualified interest, as is now asserted. There is no pretence to say, that in point of fact they are entitled to be considered as general owners. The memorandum of agreement establishes, in the most satisfactory manner, that Captain Barker is the real owner, and that Swett & Hammond are mere factors and consignees, and that their original interest in the shipment never extended beyond a lien for security of the draft of £1500 on Messrs. Wilson & Co., and their claim for commissions, insurance, and expenses. The draft of £1500 has been paid; and thus the lien of Swett & Hammond, under the agreement, is cut down to the other charges above stated. It is now asserted, that they are creditors of Captain Barker on general account, and claim a title to retain for the balance. Assuming it to be so, they are not at liberty to enforce such a claim against bonâ fide purchasers under circumstances like the present. They have never had these goods in their possession, nor the proceeds in their hands; and an attempt to affect this shipment with such a claim is directly against the stipulations in their agreement.

What then is the case before the court? It is the common case of a factor, who is consignee, claiming the property against his principal, and those asserting a derivative title from him. So far as the factor has a lien, he is certainly entitled to the protection of the court. But certainly he has no rights beyond that claim. Discharging the lien, the principal has an unquestionable right to dispose of the property in any manner, which suits his own interest or convenience. Supposing, therefore, that the original shipment vested a special property in the factors, and that the investment of the returns by Steiglitz & Co., taken in connexion with the consignment, and bill of lading to the factors also gave them a special property in the goods now in controversy, still Captain Barker had a perfect right, subject to the lien of the factors, to vest the ultimate interest in Messrs. Curtis, Aspinwall, and Upton, in the most absolute manner. They claim as bonâ fide holders under an appropriation in Cronstadt, and Swett & Hammond cannot be heard to assert a title, as general creditors, to extract it from their hands. Sitting here for the purpose of adjusting equities between the parties, I should have no difficulty in decreeing, on a proper allegation, that the claim of Swett & Hammond for commissions, insurance, and other expenses, ought to be a charge upon the proceeds in court; but that subject to these, the proprietary interest in the proceeds belonged to the other claimants. It has been said at the argument, that this claim for commissions &c. ought not to be enforced, because the proceeds now in court cannot be traced back to the original shipment to Messrs. Steiglitz & Co., so as to establish them to be the returns of that shipment. But it appears to me, that the evidence clearly establishes this fact. Then again it is objected, that Messrs. Swett & Hammond have now in their possession the policies of insurance on this very property, and are entitled to deduct the amount of their claim from that fund, whenever the loss is paid to them upon the policies. Assuming that they might so do, still if their claim is attached as an equitable lien upon the present proceeds, they are entitled to relief here. They are not bound to wait for a recovery on the policies. The latter may be an additional security to them; but it does not supersede the right of attaching their claim to these proceeds. The only point of difficulty in now giving them relief arises from another consideration; and that is the shape of their original allegation as general owners, and not as persons having a mere lien on the property. But as no exception has been taken at the bar on this account, and the argument has been wholly on the merits, I consider it as in effect waived by the parties. It would be harsh, at this last stage of the proceedings, wholly to reject such an equitable claim, or to turn the parties round to institute new proceedings, when there has been a general acquiescence in disposing of it under the original allegation. If Swett & Hammond had, in their allegation of claim, set up this special interest in the proceeds, I should have thought it proper also to allow them costs; but as they have asserted a general claim only, as absolute owners, which has been successfully resisted, it is my duty not to admit them to costs, for they have failed in the substance of their claim.

In respect to the claim of Pflug to the cordage, if it stood upon the bill of lading alone, there would be strong reason to presume in favour of his sole proprietary interest. But the bill of parcels, and especially the letter

signed by Pflug put it beyond any real doubt, that the shipment was on the joint account and risk of himself and Captain Barker. He is entitled, therefore, only to a moiety of the proceeds, and the other moiety is to be disposed of according to the appropriation thereof made by Captain Barker.

Let it be referred to a commissioner to ascertain and adjust the claims of the parties according to these principles. Decree accordingly.